UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| BENNIE GRAY, Jr., <br>     Plaintiff, | : <br> : <br> : |
| v. | :    Case No. 3:18cv1402(KAD) |
| | : |
| OFFICER BRIDGET NORDSTROM, ET AL., <br>     Defendants. | : <br> : |

## **INITIAL REVIEW ORDER**

**Preliminary Statement**

The plaintiff, Bennie Gray, Jr. ("Gray"), is currently incarcerated at Corrigan-Radgowski Correctional Institution. He filed the instant complaint under 42 U.S.C. § 1983 against Groton Police Officers Bridget Nordstrom and Emery, Norwich Parole Officer Belval, Groton Police Chief John Doe and Norwich District Parole Manager John Doe. Gray challenges the September 5, 2017 search of a car in which he was a passenger, the seizure of evidence from the car, his arrest on drug possession charges and his remand to the custody of the Connecticut Department of Correction for a parole violation. For the reasons set forth below, the complaint is dismissed in part.

**Standard of Review**

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* Rule 8 of the Federal Rules of

Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint must include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

**Allegations**

In the second week of August 2017, Gray participated in a scheduled parole meeting in New Britain with his Parole Officer, Ms. Lindley. *See* Compl. at 2 ¶ 11. Gray was in the process of trying to change his sponsor.[1] Ms. Lindley directed Gray to report to her at the New Britain

---

[1] Although not necessary to his constitutional claims, Gray includes significant detail regarding these efforts. He alleges that he informed Ms. Lindley that he wanted to "change [his] sponsor[]" from his wife, who lived in New Britain, to his aunt, Debra Carter, who lived in Groton, Connecticut, because he did not have a good relationship with his wife. *See id.* At some point after this meeting, Gray sent an application to the Norwich Region of Parole Office seeking to change his sponsor. *See id.* After receiving the application, someone from the Norwich Region of Parole Office sent parole officers to Debra Carter's home in Groton to find Gray and to inform Ms. Carter that the Parole office would not be approving her as Mr. Gray's new sponsor. *See id.* ¶ 12. Gray does not allege that he was present at his Aunt's home during the visit by Norwich parole officers. *See id.* On August 29, 2017, after learning that the Norwich Region of Parole Office would not be approving Ms. Carter as Gray's new sponsor, Ms. Lindley asked Gray to submit the name of another individual who could act as his new sponsor. *See id.* ¶ 13. Gray provided Ms. Lindley with a new sponsor by the name of Sherry Slaughter. *See id.* Ms. Slaughter lived in

Parole office on September 5, 2017. *See id.* at 2 ¶ 13. Gray was driven to the meeting with Ms. Lindley by Bobby Jo Viger ("Viger"). *See id.* at 3 ¶ 18. When Gray entered the office, Ms. Lindley placed him in handcuffs because his original sponsor no longer wanted to be his sponsor and because the Hartford Police Department had received a report that an individual "with the same name as Gray was seen in the city with a gun." *See id.* ¶¶ 15-16. Within a few minutes of placing Gray in handcuffs, Ms. Lindley learned that officers had taken the individual who had been seen with a gun into custody. *See id.* ¶ 16. She immediately released Gray to return to Ms. Slaughter's home in Groton and informed Gray that Norwich parole officers would be visiting Ms. Slaughter's home. *See id.*

New Britain parole officers searched Viger's vehicle while he was inside the parole office with Ms. Lindley. *See id.* ¶ 17. The search revealed no illegal items. *See id.* Viger drove Gray to Manchester Community College to retrieve some paperwork and then picked up Rachel Mead ("Mead") in Willimantic. *See id.* ¶ 18 & at 4 ¶ 27. Viger drove Mead and Gray from Willimantic to Groton. *See id.* When Gray entered Groton, he called Zachary T. Steward to arrange a meeting to collect money that Steward owed to him. *See id.* at 3 ¶¶ 19-20. Steward agreed to meet Gray at a Walgreen's store located near Ms. Slaughter's address on Long Hill Road in Groton. *See id.* ¶ 20.

Upon arriving at the Walgreen's, several plainclothes police officers, including Groton Police Officers Nordstrom and Emery, and Norwich Parole Officer Belval ran towards Gray's vehicle. *See id.* ¶ 21 & at 5 ¶ 37. The officers removed Gray, Viger and Mead from the vehicle.

---

Groton, Connecticut. *See id.* At some point, Ms. Lindley informed Gray that it would be permissible for him to stay with Sherry Slaughter and that Norwich parole officers would visit Ms. Slaughter's address in order to complete the process required to switch Gray's sponsor from his wife to Ms. Slaughter. *See id.* at 3 ¶ 15.

3

*See id.* at 3 ¶ 21. Officers at the scene, pat-searched Gray, Mead and Viger. *See id.* ¶¶ 21-22. The searches revealed no illegal items. *See id.* Officers placed Gray, Viger and Mead under investigatory detention. *See id.* ¶ 21 & at 7 ¶ 48. Officer Nordstrom then entered Viger's vehicle without permission and placed a brown bag containing narcotics under the driver's seat. *See id.* at 4 ¶ 23. Norwich Parole Officer Belval immediately remanded Gray into custody on the charge of possession of narcotics. *See id.* Officers at the scene did not charge Viger or Mead with a criminal offense in connection with the narcotics which Officer Nordstrom had planted in Viger's vehicle. *See id.* ¶ 25.

The police report documenting the incident included allegations that on September 5, 2017, Gray had traveled to his family's home on Brandegee Avenue in Groton to pick up narcotics and then traveled to Long Hill Road in Groton to sell the narcotics. *See id.* ¶ 26. The report also included a statement that prior to Gray's arrest, the New Britain Parole Office had notified the Groton Police Department that Gray was travelling in a vehicle driven by Viger. *See id.* The Groton Town Police Northeastern Task Force also known as the Regional Community Enforcement Task Force ("Task Force") had coordinated the drug transaction involving Gray. *See id.*

In connection with his arrest for the offense of possession of narcotics, Gray moved for a speedy trial and provided the court or the prosecutor with the GPS information from his cellular phone which documented the routes and stops that Viger's vehicle had made after leaving the New Britain Parole Office with Gray as a passenger. *See id.* ¶ 27. The State of Connecticut "entered a Nolle" dismissing the criminal charge against Gray because the State "did not want to disclose its confidential informant." *See id.* ¶ 29 & at 7 ¶ 48.

4

The Board of Parole initiated a hearing to revoke Gray's release on parole because he had been arrested on a charge of drug possession. *See id.* ¶¶ 23, 30. At Gray's revocation hearing, the Board of Parole found Gray guilty of violating a condition of his parole and revoked his term of parole. *See id.* ¶ 30. The Board of Parole "sanctioned" Gray to serve six months of imprisonment prior to re-releasing him on parole. *See id.* ¶ 31. Gray "grieved Parole's decision, but Parole refused to answer his grievance." *See id.*

**Discussion**

Gray asserts the following claims: a violation of his Fourth Amendment rights, a violation of the separation of powers doctrine embodied in the United States Constitution, deliberate indifference and negligence. *See id.* at 4-7. He sues the Groton Police Chief and the Norwich District Parole Manager in their individual and official capacities and sues Groton Police Officers Bridget Nordstrom and Emery and Norwich Parole Officer Belval in their individual capacities only. *See id.* at 1-2.

**Fourth Amendment Claims**

Gray challenges his removal from the vehicle in which he was riding at Walgreens, the search of his person, the search of the vehicle, the seizure of evidence from that vehicle and his false arrest resulting therefrom.

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

Generally, a police officer must obtain a warrant from a judicial officer before conducting a search or a seizure. *See California v. Carney*, 471 U.S. 386, 390 (1985); *New York v. Belton*,

5

453 U.S. 454, 457 (1981). Although a police officer's "temporary detention of a person ... [after] stop[ping] her vehicle ... constitutes a seizure for Fourth Amendment purposes, and thus must not be unreasonable," *see Gilles v. Repicky*, 511 F.3d 239, 244–45 (2d Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)), officers may stop and detain a motorist when they have "at least articulable and reasonable suspicion ... that either the vehicle or an occupant is ... subject to seizure for violation of law." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). "[A] police officer may as a matter of course, order" a passenger or a driver out of "a lawfully stopped car." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (per curiam)).

Gray alleges that Police Officers Nordstrom and Emery and Parole Officer Belval did not have reasonable suspicion that he or the vehicle that he had been riding in contained illegal contraband or evidence of criminal conduct. In fact, he alleges that the narcotics were planted in the car by Officer Nordstrom after the vehicle was stopped and all occupants removed. Gray also alleges that the officers conducted a pat search of his body after he exited the vehicle. Gray has stated a plausible Fourth Amendment search and seizure claim regarding his removal from the vehicle and the search of his person at the scene. This claim will proceed against Police Officers Nordstrom and Emery and Parole Officer Belval in their individual capacities.

However, a party claiming that his Fourth Amendment rights were violated by a vehicle search "must show that he had an expectation of privacy in the invaded place and that the expectation was legitimate, one that society is prepared to recognize as reasonable." *United States v. Osorio,* 949 F.2d 38, 40 (2d Cir. 1991). Gray does not allege that he had a possessory interest in the vehicle that Officer Nordstrom searched or in the item that she seized. Nor does

6

he allege that he had an expectation of privacy in the area under the driver's seat. Thus, Officer Nordstrom's search of the vehicle driven by Viger does not implicate Gray's Fourth Amendment privacy rights. *See Rakas v. Illinois,* 439 U.S. 128, 148 (1978) (holding that passengers who "asserted neither a property nor a possessory interest in the automobile" searched "nor an interest in the property seize" and who failed to show that "they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers[,]" were not entitled to challenge the search of those areas of the vehicle from which the incriminating evidence was seized under the Fourth Amendment); *United States v. Mikelic*, No. 3:10-CR-132 CFD, 2011 WL 1837844, at *4 (D. Conn. May 11, 2011) ("Mikelic does not have a reasonable expectation of privacy in the rental car and, thus, does not have standing to challenge the search of the car itself.") Thus, the Fourth Amendment claim arising out of the search of the vehicle in which Gray was merely a passenger is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Gray also asserts that Officers Nordstrom, Emery and Belval subjected him to a warrantless arrest based on narcotics that Nordstrom planted in the car in which he was a passenger. He states that the State of Connecticut subsequently entered a *nolle* and dismissed all charges against him.

False arrest claims brought pursuant to section 1983 as violations of the Fourth Amendment's right "to be free from unreasonable seizures, are substantially the same as claims for false arrest . . . under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (internal quotation marks and citations omitted). In a section 1983 action, the elements of claims for false arrest are controlled by state law. *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir.

7

2004). Connecticut law defines false arrest or false imprisonment as "the unlawful restraint by one person of the physical liberty of another.'" *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (internal quotation marks and citation omitted). In addition, to state a constitutional violation, a plaintiff must also demonstrate "an unreasonable deprivation of liberty in violation of the Fourth Amendment." *See Walker v. Sankhi*, 494 F. App'x. 140, 142 (2d Cir. 2012).

A law enforcement official violates the Fourth Amendment's protections if he or she arrests someone without probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Conversely, "probable cause is an absolute defense to a false arrest claim." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 139 (2d Cir. 2010)). The Second Circuit has observed that "federal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Weyant,* 101 F.3d at 852 and citing *State v. James,* 261 Conn. 395, 415, 802 A.2d 820, 833 (2002).

Gray alleges that neither Officer Nordstrom, Officer Emery, nor Parole Officer Belval had probable cause to believe that he had committed or was in the process of committing a crime because Officer Nordstrom planted the narcotics in the vehicle after the stop. Gray has stated a plausible Fourth Amendment false arrest claim. This claim will proceed against Officers Nordstrom, Emery and Belval in their individual capacities.

**Separation of Powers Claim**

Gray contends that the Connecticut Constitution "places responsibility for investigation and prosecution of crimes solely within the executive department" and that parole officers act as an arm of the judiciary and under the "auspices of the judicial branch in requiring [him] to submit to conditions of parole" rather than as an arm of the "police or prosecution." Gray contends that the Task Force, which is comprised of police officers from various town or city police departments and the New London's State's Attorney Office, is part of the executive department of the State of Connecticut. Thus, by permitting Parole Officer Belval to be part of the Task Force on September 5, 2017, the Task force assumed a power, supervision of parole, which is exclusively within the judicial branch. He contends that the conduct of the Task Force in stopping the vehicle he was riding in, searching him and seizing evidence from the vehicle violated the separation of powers doctrine of the United States Constitution. Even if the separation of powers doctrine provided for a private right of action, this claim fails.

As a preliminary matter, community oversight of paroled offenders is provided by the Parole and Community Services Division of the Department of Correction. *See* Conn. Gen. Stat. § 18-81 ("The commissioner [of the Department of Correction] shall be responsible for the supervision of persons released on parole by the Board of Pardons and Paroles."); Conn. Gen. Stat. § 54-124a(g) ("The Department of Correction shall be responsible for the supervision of any person transferred to the jurisdiction of the Board of Pardons and Paroles during such person's period of parole or special parole."). Parole Officer Belval is employed by the Parole and Community Services Division of the Department of Correction. The Department of Correction is part of the executive branch. *See* Conn. Gen. Stat. 4-38c. Accordingly, Gray's characterization of the Norwich Parole Office as an arm or part of the judicial branch is simply

wrong and his separation of powers argument necessarily fails as a result.

Furthermore, the separation of powers doctrine, as embodied in the federal Constitution, is not binding on state or municipal governments. *See Whalen v. United States*, 445 U.S. 684, 689 n.4 (1980) (citing *Dreyer v. Illinois*, 187 U.S. 71, 84 (1902) ("Whether the legislative, executive, and judicial powers of a state shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the state.")); *De La Garza v. Lantz*, No. 308CV15(JBA), 2010 WL 2825818, at *2 (D. Conn. July 15, 2010) (noting that "[e]ven if there existed in law an individual right to be free from a separation-of-powers violation, which there is not, the facts of this case simply cannot show any violation of the separation of powers. . . . [b]ecause, as the Supreme Court has explained, "the separation-of-powers principles that the Constitution imposes upon the Federal Government do not apply against the States") (citations omitted).

Thus, the claims based on violations of the separation of powers doctrine, as embodied in the United States Constitution, are dismissed as lacking any arguable legal basis. *See* 28 U.S.C. § 1915A(b)(1).

**Groton Police Chief  - Deliberate Indifference**

Gray alleges that the Groton Chief of Police was deliberately indifferent because he should have known that the Task Force had adopted a policy of including both police officers and parole officers as its members and had permitted its members to make unconstitutional stops, searches and seizures. This claim derives from the Plaintiff's claim that this practice violates the separation of powers doctrine. For the reasons set forth above, this claim is dismissed.

**State Law Negligent Supervision Claim**

Gray claims that the Groton Chief of Police was negligent in supervising Officer Nordstrom on September 5, 2017 because she was able to plant narcotics in the car without detection and because there was no regulation or ordinance requiring Task Force officers to wear body cameras during the detention and arrest of individuals.

To recover on a negligent supervision claim under Connecticut law, "plaintiff must plead and prove that [he or] she suffered an injury due to the defendant's failure to supervise an employee whom the defendant had [a] duty to supervise." *Brooks v. Sweeney*, 299 Conn. 196, 209 n.12, 9 A.3d 347, 355 n.12 (2010) (citing *Roberts v. Circuit–Wise, Inc.*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001)). "A defendant does not owe a duty of care to protect a plaintiff from another employee's tortious acts unless the defendant knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Roberts*, 142 F. Supp. 2d at 214 (citing *Shanks v. Walker,* 116 F. Supp. 2d 311, 314 (D. Conn. 2000)).

Gray includes no factual allegations which support the inference that the Groton Police Chief knew or reasonably should have known of the Task Force Officers' propensity to plant evidence and manufacture false arrests.

Similarly, Gray alleges negligence by the Norwich District Parole Manager for negligent supervision of Parole Officer Belval for allowing PO Belval to "assume a role as a member of the" Task Force in "direct conflict with his mission as a parole officer." These conclusory allegations, even if they stated a negligent supervision claim, which they do not, are insufficient as a matter of law. *See, e.g. Leniart v. Bundy*, No. 3:09-CV-9 CFD, 2011 WL 4452186, at *8 (D. Conn. Sept. 26, 2011) ("When a parole officer learns of the possibility that a parolee has violated

11

the conditions of his parole, the parole officer has a duty to investigate.") (citations omitted); State of Connecticut Department of Correction Administrative Directive 11.3(4)(B) ("All parole officers are designated as persons authorized to supervise offenders and to request, serve, and execute remand to actual custody orders. . . .").[2]

The negligent supervision claims against the Groton Police Chief and the Norwich District Parole Manager are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**Prayer for Relief**

Gray seeks a variety of both declaratory and injunctive relief in addition to compensatory damages. The court leaves to a future date the question of whether the declaratory or injunctive relief sought is available to the Plaintiff under the circumstances of this case.

**ORDERS**

The court enters the following orders:

(1)     The Fourth Amendment claims related to Gray's detention, search of his person and false arrest on September 5, 2017 will proceed against Groton Police Officers Bridget Nordstrom and Emery and Norwich Parole Officer Belval in their individual capacities. The federal and state law claims against John Doe Groton Police Chief and John Doe Norwich District Parole Manager in their individual and official capacities are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

(2)     **Within twenty-one (21) days of this Order**, the Clerk shall mail: a waiver of service of process request packet, including a copy of the complaint and its exhibits and this

---

[2] Administrative Directive 11.1 Parole and Community Services and 11.3 Remand of Offenders to Actual Custody (last updated 1/31/2009) are available at http://portal.ct.gov/DOC/AD/AD-Chapter-11 (last visited May 12, 2019).

order to each of the following defendants in his individual capacity at the Groton Police Department, 68 Long Point Road, Groton, Connecticut 06340: Officer Bridget Nordstrom and Officer Emery. The Clerk shall mail: a waiver of service of process request packet, including a copy of the complaint and this order to Parole Officer Belval in his individual capacity at the Norwich Parole and Community Services Office, 2-6 Cliff Street, Norwich, Connecticut 06360.

(3) Defendants Nordstrom, Emery and Belval shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules

(4) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the court.

(5) All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(6) **The Clerk shall** send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

SO ORDERED at Bridgeport, Connecticut this 21st day of May, 2019.

_____
Kari A. Dooley
United States District Judge